15-2047(L)
*Olin Corp. v. OneBeacon Am. Ins. Co.*

# In the
# United States Court of Appeals
# For the Second Circuit

—————————

August Term, 2016

(Argued: January 12, 2017      Decided: July 18, 2017)

Docket No. 15-2047(L); 15-2057 (XAP); 15-2757 (CON); 15-2763 (XAP)

—————————

OLIN CORPORATION,

*Plaintiff-Counter-Defendant-Appellee-Cross-Appellant,*

V.

ONEBEACON AMERICA INSURANCE COMPANY, REFERRED TO IN THIS LITIGATION AS
COMMERCIAL UNION INSURANCE COMPANY,

*Defendant-Appellant-Cross-Appellee,*

INSURANCE COMPANY OF NORTH AMERICA, HANOVER INSURANCE COMPANY, AS SUC-
CESSOR TO MASSACHUSETTS BONDING AND INSURANCE COMPANY, AMERICAN RE-
INSURANCE COMPANY, CERTAIN UNDERWRITERS AT LLOYDS LONDON AND LONDON
MARKET INSURANCE COMPANIES, LONDON MARKET INSURANCE COMPANIES, COMMER-
CIAL UNION INSURANCE COMPANY, AS SUCCESSOR TO EMPLOYERS LIABILITY ASSUR-
ANCE CORPORATION LTD. AND EMPLOYERS COMMERCIAL UNION INSURANCE COMPANY
AMERICA, CONTINENTAL CASUALTY COMPANY, C.E. HEALTH COMPENSATION & LIABIL-
ITY INSURANCE CO., AS SUCCESSOR TO FALCON INSURANCE COMPANY, SUCCESSOR TO
EMPLOYERS SURPLUS LINES INSURANCE COMPANY, FEDERAL INSURANCE COMPANY,
FIREMAN'S FUND INSURANCE COMPANY, GREAT AMERICAN INSURANCE COMPANY, LEX-
INGTON INSURANCE COMPANY, LONDON & EDINBURGH INSURANCE COMPANY LIMITED,
CAPITAL MARKETS ASSURANCE CORP., AS SUCCESSOR TO NATIONAL AMERICAN INSUR-
ANCE COMPANY OF NEW YORK, SUCCESSOR TO STUYVESANT INSURANCE COMPANY, NA-
TIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, NORTH
RIVER INSURANCE COMPANY, ALLSTATE INSURANCE COMPANY A/S/O MARCO DEL GADO,
AS SUCCESSOR TO NORTHBROOK EXCESS AND SURPLUS INSURANCE COMPANY, EMPLOY-
ERS INSURANCE COMPANY OF WAUSAU, ONEBEACON AMERICA INSURANCE COMPANY,
FORMERLY REFERRED TO IN THIS LITIGATION AS COMMERCIAL UNION INSURANCE COM-
PANY, AETNA CASUALTY & SURETY COMPANY, GENERAL REINSURANCE CORPORATION,

GOVERNMENT EMPLOYEES INSURANCE COMPANY, GRANITE STATE INSURANCE COMPANY, HOME INSURANCE COMPANY, INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, INTEGRITY INSURANCE COMPANY, GREENWICH INSURANCE COMPANY, AS SUCCESSOR TO HARBOR INSURANCE COMPANY, NATIONAL CASUALTY COMPANY, TRANSIT CASUALTY COMPANY, AIU INSURANCE COMPANY, CONTINENTAL CORPORATION, GOVERNMENT EMPLOYEES INSURANCE COMPANY, GRANITE STATE INSURANCE COMPANY, HARBOR INSURANCE COMPANY, NATIONAL AMERICAN INSURANCE COMPANY OF CALIFORNIA, AS SUCCESSOR TO STUYVESANT INSURANCE COMPANY, NATIONAL CASUALTY COMPANY, NEW YORK PROPERTY/CASUALTY INSURANCE SECURITY FUND, AMERICAN HOME ASSURANCE COMPANY, CENTURY INDEMNITY COMPANY,

*Defendants*,

OLIN-HUNT SPECIALTY PRODUCTS INCORPORATED,

*Third-Party-Defendant*.

———————

Before:        HALL, LIVINGSTON, and DRONEY, *Circuit Judges*.

———————

Defendant-Appellant-Cross-Appellee OneBeacon American Insurance Company ("OneBeacon") appeals from two final judgments entered in favor of Plaintiff-Counter-Defendant-Appellee-Cross-Appellant Olin Corporation ("Olin") in the United States District Court for the Southern District of New York (Griesa, *J.*). Olin cross-appeals from a grant of summary judgment in favor of OneBeacon on Olin's bad faith claim brought under Massachusetts law. Olin pursued this insurance-coverage action against its insurers, including OneBeacon, concerning environmental contamination at Olin manufacturing sites throughout the United States. This appeal arises from proceedings related to five particular manufacturing sites, and requires us to determine, *inter alia*, the proper method for allocating loss at each site and decide whether OneBeacon may reduce the limits of its liability by those of any prior insurance policies within the same layer of coverage.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

———————

CRAIG C. MARTIN (Mathew E. Price, Brian S. Scarbrough, and Matthew J. Thomas, *on the brief*), Jenner & Block LLP, Chicago, Illinois, *for Plaintiff-Counter-Defendant-Appellee-Cross-Appellant*.

2

BRYCE L. FRIEDMAN (Summer Craig, *on the brief*), Simpson Thacher & Bartlett LLP, New York, New York, *for Defendant-Appellant-Cross-Appellee.*

————————————

HALL, *Circuit Judge*:

In this consolidated appeal, Defendant-Appellant-Cross-Appellee OneBeacon American Insurance Company ("OneBeacon") appeals from two judgments entered pursuant to Federal Rule of Civil Procedure 54(b) in favor of Plaintiff-Counter-Defendant-Appellee-Cross-Appellant Olin Corporation ("Olin") in the United States District Court for the Southern District of New York (Griesa, *J.*), awarding Olin over $80 million in indemnification costs. OneBeacon appeals the district court's denials of its motions for summary judgment and the district court's ruling adopting particular special verdict interrogatories. Olin cross-appeals from a grant of summary judgment in favor of OneBeacon on Olin's bad faith claim brought pursuant Massachusetts General Laws Chapter 93A, Mass. Gen. Laws ch. 93A, § 2(a) ("Chapter 93A").

Olin, a large chemical manufacturing company, brought this coverage action against its insurers, including OneBeacon, seeking indemnification for environmental contamination at Olin manufacturing sites throughout the United States. This case requires us to resolve, among other issues, the proper method for allocating loss at each site when damage continues across a number of years and to decide whether OneBeacon may reduce the limits of its liability by those of any other prior insurance policies within the same layer of coverage.

3

For the reasons set forth below, the judgments of the district court are **AF-FIRMED IN PART, VACATED IN PART, AND REMANDED** for further proceedings.[1]

## I. BACKGROUND

This appeal presents yet another round in a protracted insurance-coverage dispute between the Olin Corporation ("Olin") and its insurers, including OneBeacon American Insurance Company ("OneBeacon"),[2] for numerous environmental insurance claims. Olin first filed an insurance-coverage action in 1983 in the District Court for the District of Columbia seeking indemnification for environmental damage at Olin manufacturing sites throughout the United States, and the action was transferred to the Southern District of New York. Because of the volume of claims and locations involved, the district court chose to address coverage on a site-by-site basis. This appeal arises out of the most recent of these site-specific proceedings, concerning contamination at five Olin manufacturing sites: (1) McIntosh, Alabama ("McIntosh"); (2) Fields Brook/Ashtabula, Ohio ("Fields Brook"); (3) Augusta, Georgia ("Augusta"); (4) Rochester, New York ("Rochester"); and (5) Bridgeport Rental & Oil Services in Bridgeport, New Jersey ("BROS").

---

[1] More specifically, we affirm the jury and summary judgment findings as to OneBeacon's liability to Olin for costs incurred at all five of the manufacturing sites at issue here, but remand for calculation of damages under the all sums approach dictated by *In re Viking Pump, Inc.*, 52 N.E.3d 1144 (N.Y. 2016), and associated prejudgment interest. We further vacate and remand for the district court to apply the OneBeacon insurance policies' prior insurance provision and to determine the effect of Olin's prior settlements with its London Market Insurers on the recovery available under the OneBeacon policies, in accordance with the analysis set forth in Part II.E of this opinion. Finally, we affirm the judgment of the district court with respect to Olin's Chapter 93A claim.

[2] The term "OneBeacon" as used in this opinion refers also to each of that company's predecessors.

## A.   THE MANUFACTURING SITES

The McIntosh site is an Alabama property that was added to the National Priority List ("NPL") pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA"), in 1984. The NPL identifies polluted or potentially polluted sites for purposes of CERCLA enforcement by the United States Environmental Protection Agency ("EPA"). The EPA divided the McIntosh site into two "operable units" relevant to this appeal: Operable Unit 1 ("OU1") and Operable Unit 2 ("OU2").[3] OU1 contains Olin manufacturing plants producing chlorine, caustic soda, and crop chemicals. OU2 encompasses a 65-acre natural basin adjacent to the plant, into which wastewater from the plant was regularly discharged. Olin's third-amended complaint, the operative complaint here, relates exclusively to OU2. At trial, the parties stipulated that Olin incurred $15,656,076.07 in cleanup and remediation costs for OU2 through December 31, 2014.

The Fields Brooks site is located in Ohio and houses a plant that once produced the chemical "TDI." Property damage at Fields Brook began in 1964 due to the discharge of contaminated wastewater into a brook running through the property, which in turn contaminated the brook's sediments.[4] The parties stipulated that Olin incurred $5,105,238.27 in costs through December 31, 2014.

---

[3] An "operable unit" is a "[t]erm for each of a number of separate activities undertaken as part of a Superfund site cleanup." App'x at 685.

[4] The parties stipulated that property damage at Fields Brook began in 1964, and the jury found that the damage ended in 1978. App'x at 1829.

The Augusta site holds a Georgia chlor-alkali plant that produced chlorine and caustic soda. The operations at this site led to the continuous mercury contamination of the surrounding groundwater and the ecosystem around the plant's intake canal. The parties stipulated that Olin incurred $13,754,618.69 in costs for the groundwater contamination and an additional $2,964,074.78 for cleanup of the intake canal through December 31, 2014.

The Rochester site housed a plant that produced specialty organic chemicals. Operations resulted in the continuous and repeated exposure of groundwater to chemical contaminants. The parties stipulated that Olin incurred $16,418,746.53 in relevant costs at this site through December 31, 2014.

The BROS site involves a New Jersey property where Olin stored spent sulfuric acid between 1968 and 1974.[5] Olin and OneBeacon stipulated that Olin incurred $300,000 in costs through December 31, 2014.

Beginning in 1984, Olin sent formal notices to OneBeacon and its other insurers identifying government orders requiring investigation and cleanup at various Olin sites, including Fields Brook, Augusta, and McIntosh. In 1986, Olin sent OneBeacon and other insurers a supplemental notice of claims concerning additional sites, including the BROS and Rochester sites. The notices detailed Olin's damages at each site and described Olin's remediation measures. The notices also invited insurers, including OneBeacon, to investigate Olin's claims. Olin regularly supplemented these notices with updated information about damages, costs, and remedial

---

[5] The district court granted Olin's motion for partial summary judgment as to the BROS site and concluded as a matter of law that property damage occurred from 1968 through 1974. It later denied OneBeacon's request for a jury trial regarding allocation of damages at the BROS site.

measures at each site. Between February 1984 and January 1992, Olin sent One-Beacon fifteen claims notices that related to, at least in part, one or more of the five sites.

According to Olin, OneBeacon never responded. It was not until Olin amended its complaint in 1993, adding coverage claims against OneBeacon for the five sites, that OneBeacon acknowledged receipt of Olin's claims notices. In its answer to this complaint, OneBeacon asserted various defenses denying coverage. Discovery later requested by Olin revealed that OneBeacon had neglected to conduct any investigation into Olin's coverage claims. Discovery also exposed that OneBeacon lacked factual support for numerous affirmative defenses and had delegated its claims handling responsibilities to one of its reinsurers. Last, through discovery in a related case, Olin learned that OneBeacon imposed "dollar targets" on its claims adjusters and would seek to litigate, rather than pay, claims because it was "cheaper" to do so.

### B. THE ONEBEACON POLICIES

OneBeacon issued Olin three excess umbrella insurance policies for the period of 1970 through 1972. Because the OneBeacon policies are "excess" policies, each policy provides coverage only where the underlying insurance policies have been "exhausted" or have had their limits per occurrence paid out. The OneBeacon policies "attach" at various points above an underlying "primary" commercial general liability policy issued by the Insurance Company of North America ("INA"), which covered the first $300,000 of loss attributable to property damage at the manufac-

7

turing sites. The first OneBeacon policy attaches at $300,000 and has a per occurrence limit of $1 million. The next OneBeacon policy attaches at $1.3 million and has a $4 million per occurrence limit. Finally, the third OneBeacon policy attaches at $5.3 million and provides $15 million in coverage. In short, OneBeacon's policies provide up to $20 million in coverage, in excess of $300,000, per occurrence. Effective January 1, 1971, OneBeacon's three excess policies included a pollution exclusion.[6] Accordingly, for the purposes of this appeal, the policy period for Olin's coverage under the three OneBeacon excess policies is January 1, 1970 through December 31, 1970.

The OneBeacon policies provide coverage for "all sums which the Insured shall be obligated to pay by reason of the liability . . . imposed upon the Insured by law . . . for damages, direct or consequential and expenses . . . on account of . . . Property Damage . . . caused by or arising out of each occurrence . . . ."[7] App'x at 2131. An "occurrence" is defined as "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally result[s] in . . . property damage . . . during the policy period." *See, e.g.*, App'x at 2134. Each OneBeacon policy also contains a condition on coverage known as a "prior insurance" provision (or "noncumulation" clause) and a "continuing coverage" clause. Both clauses are found in Condition C of the policies.

Condition C specifically provides:

---

[6] We express no view on the correct interpretation of this provision.

[7] The policies define "Property Damage" as "loss of or direct damage to or destruction of tangible property." App'x at 2133.

8

> It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Insured prior to the inception date hereof, the limit of liability hereon . . . shall be reduced by any amounts due to the Insured on account of such loss under such prior insurance.
>
> Subject to the foregoing paragraph and to all other terms and conditions of this Policy in the event that personal injury or property damage arising out of an occurrence covered hereunder is continuing at the time of termination of this Policy, [OneBeacon] will continue to protect the Insured for liability in respect of such personal injury or property damage without payment of additional premium.

App'x at 2138. The first paragraph constitutes the prior insurance provision and the second is the continuing coverage clause.

Finally, the "loss payable" provision (Condition J) governs when the OneBeacon policies are triggered. "Liability under this Policy with respect to any occurrence shall not attach unless and until the Insured, or the Insured's Underlying Insurer, shall have paid the amount of the Underlying Limits on account of such occurrence." App'x at 2140. In other words, under Condition J, the OneBeacon excess policies will not attach until the $300,000 primary INA layer is exhausted.

## C.    THE PRIOR EXCESS POLICIES

Each of the OneBeacon policies at issue is preceded in time by prior insurance in the same layer of coverage (the "Prior Excess Policies"). The Prior Excess Policies include policies issued by certain underwriters at Lloyd's, London (the "London Market Insurers"). The first two layers of the OneBeacon policies, for example, are preceded in the same layer by excess policies issued by the London Market Insurers dating from the 1950s through 1969. The Prior Excess Policies provide

9

substantially the same coverage as that provided by the OneBeacon policies for the sites at issue. Like the OneBeacon policies, the Prior Excess Policies generally provide coverage for all sums Olin becomes legally obligated to pay for property damage during the policy period caused by an occurrence

### D.   OUR COURT'S PRIOR *OLIN* DECISIONS

There have been a number of related appeals concerning Olin's environmental insurance claims stemming from other contaminated sites, which implicated other insurers and policies. Several of those decisions set the stage for this appeal. First, in *Olin Corp. v. Insurance Co. of North America* ("*Olin I*"), 221 F.3d 307 (2d Cir. 2000), we addressed Olin's claim for coverage from its primary insurer (INA) for soil and groundwater contamination that occurred over a 35-year period at a pesticide manufacturing plant in North Carolina. There, we determined that the appropriate method for "allocating" responsibility for "on-going and progressive injury that spans many years" is to do so "pro rata." *Id.* at 322–24. Under this pro rata method, the total property damage is divided into equal annual shares for each year in which such damage took place. This annual share is then treated as the total property damage attributable to that occurrence for that year, and the insurer providing coverage for that year is responsible for indemnifying an insured only to the extent of its contractual liability for such deemed property damage.

In *Olin Corp. v. Certain Underwriters at Lloyd's London* ("*Olin II*"), 468 F.3d 120 (2d Cir. 2006), we decided a claim seeking coverage from an excess insurer for soil and groundwater contamination resulting from operations at a chemical manu-

10

facturing plant in upstate New York. The principal issue on appeal was how to identify the policies triggered as a result of the continuing environmental harm. In rejecting Olin's proposed model, we concluded that "property damage occurs as long as contamination continues to increase or spread," and includes not only "contamination . . . based on active pollution" but also "the passive migration of contamination into the soil and groundwater." *Id.* at 131. We further clarified that, under the pro rata approach, in the absence of specific evidence to the contrary, the default is to allocate loss equally across the years during which "continuous" property damage was sustained. *Id.* at 127. We explained, however, that "if it could be determined exactly how much property damage occurred in each year, then the indemnifiable remediation costs could be allocated" to the specific years in which the damage occurred, rather than equally across all years in which the progressive environmental harm was continuing. *Id.*

Last, in *Olin Corp. v. American Home Assurance Co.* ("*Olin III*"), 704 F.3d 89 (2d Cir. 2012), we addressed the application of a similar prior insurance provision to that implicated here. *Olin III* concerned Olin's coverage-claim against American Home Assurance Company ("American Home") for its Morgan Hill, California manufacturing site, which had become contaminated as a result of Olin's discharge of chemicals into soil and groundwater over a period of 31 years. 704 F.3d at 93. At issue were two consecutive American Home excess policies covering periods from 1966 through 1968 and 1969 through 1971, attaching at $30.3 million. Both policies

included a provision identical in all material ways to the version of Condition C included in the OneBeacon policies implicated here. *Id.* at 94.

We concluded that while our prior decisions require the pro rata allocation of damages in cases involving long-tail claims, the continuing coverage clause of Condition C must still be given effect. *Id.* at 101. Accordingly, we held that, pursuant to the continuing coverage clause, American Home would still be liable for damage continuing after the termination of its policy. *Id.* at 102. At the same time, however, we also held that the prior insurance provision reduceed the per occurrence limit on American Home's later-issued policy by the amount paid out under American Home's prior policy (at the same level of excess coverage), to the extent that both policies were triggered by the same loss. *Id.* at 104. We explained that this approach was consistent with "Condition C's apparent purpose of sweeping a continuing loss into the earliest triggered policy, with that policy then fully indemnifying the insured for that loss." *Id.* However, bound by our earlier decision in *Olin I*, we also held that the pro rata approach, rather than the all sums (or joint and several liability) approach, continued to govern the allocation of loss across a damage period. *Id.* at 102-03. Condition C obligated an insurer "to indemnify Olin up to the limits of its policies for all property damage caused by the [environmental contamination] that occurred *during and after* the termination of each policy." *Id.* at 101–02 (emphasis added). But "Condition C alone [could not] trigger joint and several liability in lieu of the pro rata allocation methodology employed in *Olin I* . . . ." *Id.* at 103.

12

Applying these principles, we held that the language of the prior insurance provision reduced the $1 million limit of the American Home policy covering the period from 1969 through 1971 by the $1 million limit of the prior American Home policy, at the same level of coverage, spanning the period from 1966 through 1968, such that the total per occurrence coverage offered by American Home remained at $1 million. *Id.* at 105. Because both of the policies at issue in *Olin III* were issued by the same insurer—American Home—we did not have to resolve the question we are called upon to resolve in this appeal: how a prior insurance provision applies when the prior policy was underwritten by a different insurer. *See id.* at 105 n.21.

E.    THE DISTRICT COURT PROCEEDINGS

On April 3, 2013, OneBeacon moved for partial summary judgment with respect to the prior insurance provision of Condition C contained in the OneBeacon policies. Because each of the OneBeacon policies is preceded in the same layer of coverage by the Prior Excess Policies, OneBeacon sought a ruling that the prior insurance provision requires that the occurrence limits of the OneBeacon policies be reduced by the occurrence limits of *any* prior policy in the same layer of coverage triggered by the same occurrence, irrespective of which insurer issued the earlier policy or policies.

The district court summarily denied OneBeacon's motion at oral argument, ruling from the bench:

> The motion for summary judgment by OneBeacon is denied. . . . [T]he language that is critical is as follows: "It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to

13

> the insured prior to the inception date hereof." I am holding that that applies to any other excess policy *issued by the same insurer, not to other excess policies issued by miscellaneous possible insurers.*

Special App'x at 2 (emphasis added). The court reasoned that:

> The paragraph, in my view, if it is not limited as I have said, . . . would be hopelessly vague and subject to numerous possible factual issues in applying it. Also, it would relieve the insurer of possibly 100 percent liability on a policy for which substantial premiums were paid to obtain something other than possibly no liability.

*Id.*

The district court also denied OneBeacon's motion for partial summary judgment on Olin's McIntosh claim. OneBeacon argued that—because of a February 21, 2006 stipulation of dismissal with prejudice—the McIntosh claim must be dismissed. In 2006, prior to an earlier trial against other insurers relating to Olin's request for indemnification in remediating the environmental damage at the McIntosh OU1 site, the parties entered into a stipulation dismissing certain claims as against OneBeacon. The stipulation, which was endorsed by the district court, stated: "Plaintiff, Olin Corporation, by its undersigned counsel, hereby stipulates to the voluntary dismissal, with prejudice, of any claims concerning [OneBeacon] relating to the McIntosh, Alabama site." App'x at 742. The district court denied OneBeacon's motion, concluding that this stipulation related only to the OU1 portion of the McIntosh site. The court noted that:

> The stipulation of February 21 is worded broadly, as OneBeacon points out, and it is not limited in its language to OU1 or to what was being literally tried. And it would have been a good idea if this stipulation, when presented

14

> and signed, had been revised. And it was a mistake not to revise it. The language is too broad. But for me to say that Olin has given up substantial insurance coverage because of that mistake, I simply won't do it. We have all made mistakes in our professional lives, and the best thing to do in a civilized litigation court process is to help people out of those mistakes.

Special App'x at 4.

In October of 2013, the parties proceeded to trial on the McIntosh OU2, Fields Brook, Augusta, and Rochester sites.[8] The trial focused on two principal issues: (1) whether, as of 1970, Olin expected or intended the property damage ultimately sustained at the various manufacturing sites; and (2) the allocation of damages across the years during which property damage occurred at each site. Before giving the case to the jury, the district court rejected OneBeacon's proposed jury interrogatory regarding expected or intended injury, which asked the jury to find a specific date by which Olin expected or intended the damage. Instead, the court asked the jury, with respect to each site, whether "[b]y the time of the policy period of 1970, [] Olin expect[ed] or intend[ed] the property damage that it was obligated to remediate?" *See, e.g.*, App'x at 1824. The jury ultimately returned a verdict in favor of Olin, finding that Olin did not expect or intend the damage by the time of the policy period of 1970 as to each of the four trial sites. With respect to McIntosh OU2 and Augusta, the jury found that progressive environmental harm was continuing throughout the period identified by the parties in the verdict form, and allocated

---

[8] The district court granted summary judgment in favor of Olin regarding OneBeacon's liability at the BROS site, determined the progressive damage period, and allocated damages evenly across the entire period. OneBeacon does not appeal that ruling. In addition, the court granted OneBeacon's request to bifurcate the trial and defer discovery on Olin's Chapter 93A claim under Massachusetts law.

15

damage equally across all years. With respect to Fields Brook, the jury determined that progressive environmental damage ended in 1978, and assigned various amounts of the total damage to each year in that period. Finally, with respect to Rochester, the district court concluded, without dispute from OneBeacon, that property damage began in 1962 and continued through 1986, and also that the damage should be allocated to each year on a pro rata basis.

After trial, Olin sought discovery on its Chapter 93A claim but faced resistance from OneBeacon.[9] OneBeacon eventually moved for summary judgment, which the district court granted. Ruling again from the bench, the court concluded that "based upon [its] personal knowledge and participation in this litigation, OneBeacon never" engaged in any unfair and deceptive practices. Special App'x at 28. The court entered an order to the same effect.

In the year following trial, the parties calculated the total damages owed by OneBeacon. On January 6, 2015, OneBeacon moved for partial summary judgment regarding prejudgment interest. OneBeacon asserted that, because Olin did not make a "definite claim" for coverage (as required by its policies) until after the jury verdict, Olin was not entitled to any prejudgment interest. The district court rejected OneBeacon's argument because it found that Olin had sent numerous notice letters to OneBeacon identifying its claims beginning in the 1980s and that OneBea-

---

[9] Section 2(a) of Chapter 93A of Massachusetts General Laws prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). In turn, Chapter 176D enumerates certain specific acts or omissions within the insurance industry that give rise to a Chapter 93A claim, including "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information." Mass. Gen. Laws ch. 176D, § 3.

16

con failed to investigate such claims, instead choosing litigation. As a result, the district court concluded that OneBeacon was required to compensate Olin with pre-judgment interest running separately with respect to each indemnifiable expense from each of the several dates on which Olin incurred remediation costs.

Finally, in the spring of 2015, the district court entered two Rule 54(b) judgments in favor of Olin, one for the BROS site and another for the remaining four sites. Each judgment determined the total damages owed by OneBeacon based on the parties' stipulations concerning the total loss incurred at each site, the jury's findings and parties' stipulations concerning how that loss was to be allocated across years of property damage, and the continuing-coverage approach employed by this Court in *Olin III*. In particular, the district court, following *Olin III*, concluded that Olin could seek indemnification under OneBeacon's 1970 policy not only for property damage allocated to that year, but also—because of the continuing coverage clause—for property damage arising from the same occurrence allocated to subsequent years. Applying this approach, the Rule 54(b) judgments, including pre-judgment interest totaling $42,691,481.75 for the four trial sites and $3,385,691.45 for the BROS site, resulted in a total judgment entered in Olin's favor of $87,187,173.63.

OneBeacon subsequently filed post-judgment motions pursuant to Federal Rules of Civil Procedure 50, 59, and 60 with respect to both Rule 54(b) judgments, raising the same issues raised on appeal. The district court denied the motions. OneBeacon appeals from both final judgments, and Olin cross-appeals the district

17

court's grant of summary judgment in favor of OneBeacon on Olin's Chapter 93A claim.

## II.     DISCUSSION

### A. *VIKING PUMP*

Between when judgment was first entered in this case and oral argument, the New York Court of Appeals issued its decision in *In re Viking Pump, Inc.*, 52 N.E.3d 1144 (N.Y. 2016). Because this decision is dispositive with respect to certain issues presented on this appeal, and highly instructive with respect to others, we briefly summarize it here.

In *Viking Pump*, the Court of Appeals began by reiterating its general approach to the interpretation of the provisions of an insurance contract. As the Court of Appeals explained, "[w]e emphasized in *Consolidated Edison*[, 774 N.E.2d 687, 693 (N.Y. 2002), the first Court of Appeals decision to interpret a contract as requiring pro rata allocation], and have reiterated thereafter, that in determining a dispute over insurance coverage, courts first look to the language of the policy." *Viking Pump*, 52 N.E.3d at 1151 (alterations and internal quotation marks omitted). Thus, in pre-*Viking Pump* decisions upholding the propriety of pro rata allocation of losses spanning policy years, "[w]e did not adopt a strict rule mandating either pro rata or all sums allocation because insurance contracts, like other agreements, should be enforced as written, and parties to an insurance arrangement may generally contract as they wish and the courts will enforce their agreements without passing on the substance of them." *Id.* (internal quotation marks omitted). In sum,

18

when confronted, in the context of a given insurance contract, with the question whether losses associated with "long-tail" claims are properly distributed pro rata across all policy years during which the harm was continuing or whether an "all sums" approach is more appropriate, courts are to use ordinary tools of contractual interpretation to resolve the issue. *See id.*

The Court of Appeals then went on to explain why, in its view, the insurance contracts before it—each of which included at least the prior insurance provision[10]—required application of the all sums approach, as well as its view of what the all sums approach required. First, the Court of Appeals explained that since the prior insurance provision "plainly contemplate[s] that multiple successive insurance policies can indemnify the insured for the same loss or occurrence," *id.* at 1153, indemnification obligations under insurance contracts containing such a provision should be determined under the all sums, or "joint and several[,]" approach, which "permits the insured to collect its total liability under any policy in effect [and indemnifies the insured for the loss] during the periods that the damage occurred up to the policy limits," *id.* at 1149. (alterations and internal quotation marks omitted). As further support for its conclusion, the Court of Appeals contrasted all sums allocation with pro rata allocation. *See id.* at 1153–54. Noting that the "very essence of pro rata allocation is that the insurance policy language limits indemnification to losses and occurrences during the policy period—meaning that no two insurance policies,

---

[10] Not all of the policies in *Viking Pump* included a provision like the continuing coverage clause—some contained only the prior insurance provision—but the Court of Appeals explained that inclusion of a continuing coverage clause "further compels" a determination that all sums—not pro rata—allocation was intended in such policies. 52 N.E.3d at 1154.

19

unless containing overlapping or concurrent policy periods, would indemnify the same loss or occurrence," *id.* at 1153, the Court of Appeals explained that under pro rata allocation, noncumulation and prior insurance provisions would be rendered surplusage—"a construction that cannot be countenanced under [New York] principles of contract interpretation," *id.* at 1154.

The Court of Appeals then turned to the related question of "whether horizontal or vertical exhaustion applies under the relevant policies." *Id.* at 1156. Under the horizontal exhaustion approach, an insured is required to "exhaust all triggered primary and umbrella excess layers before tapping into any of the additional excess insurance policies," while under vertical exhaustion "the [i]nsured[] [can] access each excess policy once the immediately underlying policies' limits are depleted, even if other lower-level policies during different policy periods remain unexhausted." *Id.* In resolving this question, the Court of Appeals explained that the language of policies containing Condition C militated in favor of vertical exhaustion because "vertical exhaustion is more consistent . . . with th[e] language tying attachment of the excess policies specifically to identified policies that span the same policy period" and because "vertical exhaustion is conceptually consistent with an all sums allocation, permitting the [i]nsured to seek coverage through the layers of insurance available for a specific year." *Id.* Thus, the Court of Appeals held that an insured could pursue insurers whose policies contained a prior insurance provision for indemnification irrespective of whether policies covering other years over the course of the loss period potentially were triggered by the same occurrence.

20

Finally, it is worth noting the ways in which the approach adopted by the Court of Appeals requires some modification of the approach we, bound by our earlier interpretations of New York law, took in *Olin III* (which guided the district court's judgment here). In *Olin III*, we held that, under the contracts at issue, property damage assigned to a period after the applicable policy year would be swept back into the "earliest triggered policy." 704 F.3d at 104. But, under *Viking Pump*, the insured can pursue any insurer whose policy contains Condition C, and whose policy covers property damage during the relevant period, for all damage reaching the insurer's policy layer regardless of "when" it took place. In other words, *Viking Pump* departs from the "legal fiction" that property damage can be cleanly allocated between policy years, and instead adopts a joint and several liability theory that allows the insured to seek indemnification for the full amount of damage incurred over the continuing damage period from any insurer whose policy language dictates all sums liability with language similar to Condition C. 52 N.E.3d at 1153.

## B. EXHAUSTION OF OLIN'S PRIMARY POLICIES

At the outset, we must determine whether Olin's primary policies have been exhausted so as to trigger OneBeacon's excess policies. OneBeacon encourages us to adopt a "hybrid" allocation/exhaustion scheme, contending that, because the underlying INA policies do not contain Condition C, we must use pro rata allocation to determine whether the underlying primary policies have been exhausted (and thus whether OneBeacon's policies have attached). Only then, it argues, once OneBea-

21

con's policies have attached, does all sums allocation apply to OneBeacon's excess policies. In other words, OneBeacon submits that we should apply horizontal exhaustion to the INA primary layers and vertical exhaustion to its policies. Under this "hybrid" approach, OneBeacon asserts that the underlying INA primary policies have not been exhausted, and therefore OneBeacon's $300,000 attachment point has not been met. Because OneBeacon's policies call for all sums allocation, and the New York Court of Appeals' decision in *Viking Pump* dictates vertical exhaustion where the all sums approach is the proper method for allocation, we conclude that Olin's underlying policies have been exhausted and OneBeacon's policies have attached.

As explained above, *Viking Pump* identifies the proper method for determining exhaustion in cases, such as this one, where the excess policy at issue contains a provision like Condition C. The Court of Appeals specifically held that, for policies incorporating a prior insurance provision (and by extension all sums allocation), vertical exhaustion is the appropriate method for determining the attachment of excess policies. *Id.* at 1156–58. *Viking Pump* explains that "vertical exhaustion is conceptually consistent with an all sums allocation, permitting the [i]nsured to seek coverage through the layers of insurance available for a specific year." *Id.* at 1156. The concept of vertical exhaustion "allow[s] the [i]nsureds to access each excess policy once the immediately underlying policies' limits are depleted, even if other lower-level policies during different policy periods remain unexhausted." *Id.* Horizon-

tal exhaustion, by contrast, requires that lower-level policies throughout the continuing damage period be exhausted before excess policies are triggered.

The Court of Appeals reasoned that "vertical exhaustion is more consistent than horizontal exhaustion" with the particular policy language where the "attachment of the excess policies" is tied "specifically to identified [primary] policies that span the same policy period." *Id.* This is precisely how OneBeacon's policies operate here, as the loss payable provision merely requires that the underlying primary policies (the INA policies) must be exhausted before OneBeacon's policies attach. To somehow import horizontal exhaustion into OneBeacon's policies by virtue of the underlying INA policies would contradict *Viking Pump*'s rule that vertical exhaustion controls when policies contain a prior insurance provision.

By demanding vertical exhaustion for policies contemplating all sums allocation, *Viking Pump* explicitly determined that an insured in Olin's position does not need to exhaust primary policies outside the policy year to reach the excess layer for its chosen policy year. Thus, *Viking Pump* dictates that we reject OneBeacon's position that the pro rata approach applies to determine whether the underlying INA primary policies have been exhausted. Rather, an insured may simply tap a particular tower of its insurance program triggered by an occurrence and proceed up the tower upon depletion of the policies within each layer of coverage (just as Olin seeks to do here). We therefore conclude that, because it is not disputed that the damages at each site far exceed OneBeacon's attachment point of $300,000 when apportioned to a single policy year, OneBeacon's policies have been triggered.

23

## C. THE MCINTOSH STIPULATION

We now turn to the effect of the McIntosh stipulation, if any, on OneBeacon's liability for Olin's claims for indemnification arising from cleanup costs at the OU2 McIntosh site. OneBeacon argues that the district court erred in denying its summary judgment motion related to the McIntosh OU2 site because the February 21, 2006 stipulation unambiguously dismissed all claims related to the "McIntosh, Alabama site," which included both operable units. Although the stipulation refers broadly to the "McIntosh, Alabama site," because—considered within the context of the 2006 trial—such a term could reasonably be interpreted as referring only to OU1, we affirm the district court's denial of summary judgment.

Here, while the agreement specifically provided that Olin "stipulates to the voluntary dismissal, with prejudice, of any claims concerning [OneBeacon] relating to the *McIntosh, Alabama site*," App'x at 742 (emphasis added), circumstances clearly indicate that the stipulation was not designed to cover both OU1 and OU2. Indeed, the parties entered into the stipulation at the start of the 2006 trial, which concerned liability related only to OU1. By 2006, the EPA had determined an environmental remedy for only OU1. Because its total costs for OU1 were known, Olin proceeded to trial on that unit first. In fact, cleanup at OU2 was still ongoing in 2006, and since the full remedy for that site was not yet ascertainable, Olin held off in pursuing its indemnification claims for loss arising from that unit of the McIntosh site. In Olin's 2006 pretrial correspondence with the London Market Insurers, moreover, Olin clarified that it sought to recover costs associated specifically with

24

remediation for OU1. Olin's pretrial disclosures also repeatedly defined the term "McIntosh" as the "McIntosh, Alabama site which is the subject of the February 21, 2006 trial." App'x at 723, 726. Additionally, Olin agreed to the stipulation with OneBeacon only because it expected full indemnification from the London Market Insurers through its recovery at trial. *See id.* at 740, 870 (Olin's counsel notifying excess insurers, including OneBeacon, that its "excess insurance carriers, other than LMI . . . are not likely to be implicated in the upcoming McIntosh [t]rial.").

The district court's conclusion that Olin could not have intended to release OneBeacon from liability for OU2 at the time of the 2006 trial for OU1 was thus proper. The district court's denial of summary judgment with respect to the McIntosh site on this ground is therefore affirmed.

### D. SPECIAL VERDICT FORM

OneBeacon also argues that a new trial is warranted because the district court "committed legal error by adopting a special verdict form premised on an incorrect interpretation of the OneBeacon Policies." Appellant's Br. at 66. We review for abuse of discretion a district court's formulation of special verdict questions. *See Vichare v. AMBAC Inc.*, 106 F.3d 457, 465 (2d Cir. 1996). A jury interrogatory is erroneous when it "mislead[s] or confuse[s] the jury, or if [it] inaccurately frame[s] the issues to be resolved by the jury." *Id.*

The district court posed the following interrogatory to the jury: "By the time of the policy period of 1970, did Olin expect or intend the property damage that it was obligated to remediate? If your answer . . . is no, proceed to the further ques-

25

tions. If your answer . . . is yes, proceed no further . . . ." *See, e.g.*, App'x at 1824. The jury answered in the negative as to each site. OneBeacon contends that this "interrogatory was clearly erroneous because the jury was not permitted to return a verdict finding that property damage *after* 1970 was expected or intended by Olin." Appellant's Br. at 68 (emphasis added). So the argument goes: because of the faulty jury instruction, OneBeacon may have been required to indemnify against expected or intended property damage, contrary to policy language dictating that OneBeacon is responsible to indemnify Olin only for unexpected or unintended property damage. OneBeacon claims that the district court should have instead asked the jury whether "Olin expect[ed] or intend[ed] property damage that it was obligated to remediate[,]" and if "Yes," "by what date[.]" Appellant's Br. at 65.

OneBeacon's policies require indemnification where there has been "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally result in . . . property damage . . . *during the policy period.*" App'x at 2134 (emphasis added). The policies at issue, upon consideration of the pollution exclusion effective January 1, 1971, cover the period from January 1, 1970 through December 31, 1970. We understand the district court's interrogatory as asking whether Olin expected or intended any property damage within the policy period beginning in 1970. This conforms to the language of OneBeacon's policy defining an occurrence as an unexpected or unintended event happening during the period in which the policies provide coverage. Under the language of the policy, whether Olin *later* expected or intended the property damage that was ongo-

26

ing is irrelevant. Indeed, the continuing coverage clause—which states that One-Beacon must continue to provide coverage "in the event that . . . property damage arising out of an occurrence covered hereunder is continuing at the time of the termination" of the policy—contains no language suggesting that such continuing property damage must remain "unexpected" or "unintentional." *Id.* at 2138. Because the court's interrogatory asking the jury whether Olin expected or intended property damage by 1970 correctly framed the issue of liability, under the terms of the OneBeacon policies there was no error in the district court's instruction. The district court's ruling as to the special verdict form is affirmed.

### E. DAMAGES

In sum, under *Viking Pump*, Olin may "collect its total liability under any policy in effect during the periods that the damage occurred, up to the policy limits." 52 N.E.3d at 1149 (alteration and internal quotation marks omitted). Because the jury determined that property damage continued during the years in which Olin was covered by OneBeacon's policies and that Olin did not expect or intend this damage (at least during the OneBeacon policy year at issue), Olin may pursue One-Beacon for full indemnification for its costs at these sites up to the policy limits for the 1970 year. Thus, OneBeacon's total liability to Olin (before calculating pre-judgment or post-judgment interest) after *Viking Pump* can be computed as Olin's total remediation costs, less $300,000, at each of the manufacturing sites at issue, with Olin's total recovery capped only by the relevant policy limits. Because the district court, relying on our opinion in *Olin III*, capped Olin's recovery at the loss

27

attributable, under the pro rata method, to the 1970 policy year and to years subsequent, we vacate and remand for entry of a new damages judgment on the basis of the methodology dictated by *Viking Pump*.

**F. PRIOR INSURANCE PROVISION**

OneBeacon next asserts that the judgments of the district court should be vacated because the court failed to give effect to the prior insurance provision of OneBeacon's policies, thereby reducing the limits of its policies by those of any prior policies covering the same loss. We agree. Where an occurrence spans multiple policy years, the plain language of the prior insurance provision requires the reduction of the occurrence limit of a OneBeacon policy by amounts due under any prior excess insurance policy on account of a loss covered by a prior insurance policy in the same layer of coverage as the relevant OneBeacon policy, when that prior insurance policy is triggered by the same occurrence for which the insured presently seeks indemnification. *See Olin III*, 704 F.3d at 104 (concluding that prior insurance provision of excess insurance policies reduced insurer's liability to the extent that a prior insurance policy at the same level of coverage indemnified for a loss that was also covered by insurer's excess policies). This prevents an insured from stacking, or cumulating, coverage—that is, where an insured that has suffered a long-term or continuous loss triggering coverage across more than one policy period attempts to add together the maximum limits of all successive policies that have been in place during the period of the loss. *See Viking Pump*, 52 N.E.3d at 1152; Steven Plitt et al., *Couch on Insurance* § 169:5 (3d ed.) (West 2017).

28

Our decision in *Olin III*, though not dispositive, is instructive, as we did not directly address the question before us here: whether a prior insurance provision applies to *any other* excess policy issued within the same layer, and not just a prior policy issued by the *same insurer*. *See Olin III*, 704 F.3d at 105 n.21. Moreover, as we explain, resolution of this inquiry is intertwined with the question of the proper mode of allocation of damages for a multi-year loss.

We turn first to principles of contract interpretation to inform our analysis. Under New York law, insurance policies are interpreted according to general rules of contract interpretation. *See, e.g.*, *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 183–84 (2d Cir. 2003), *abrogated on other grounds by Wachovia Bank v. Schmidt*, 546 U.S. 303 (2006). Two such rules are particularly relevant here. First, the "words and phrases [in a contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (alteration and internal quotation marks and ellipsis omitted). Any interpretation of a contract that "has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible." *Id.* (alteration and internal quotation marks omitted).

Second, contract terms are ambiguous if they are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular

29

trade or business." *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir. 1996). When a provision in an insurance contract is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent at the formation of the contract. *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009). If the extrinsic evidence fails to establish the parties' intent, courts may apply other rules of contract interpretation, including New York's insurance-specific version of the rule of *contra proferentem*, according to which ambiguity should be resolved in favor of the insured. *See Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 697–98 (2d Cir. 1998). Ambiguity is absent where the contract's language provides "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (alteration omitted). With these principles in mind, we hold that the prior insurance provision of Condition C is unambiguous and that the district court erred when it concluded that the prior insurance provision did not apply to reduce the limits of OneBeacon's liability.

To begin with, we conclude that the language of the prior insurance provision, on its face, applies to "any other excess policy," and is not limited to prior policies issued by the same insurer. Indeed, there is no language in Condition C that might imply that the prior insurance provision is limited in application to any other excess policy issued only by the *same* provider. Rather, the general language of the prior insurance provision suggests that the clause is designed to apply whenever

30

both earlier and later polices cover the same loss, just as the focus of noncumulation clauses is whether more than one policy provides coverage for identical loss within the same layer, unaffected by the identity of the insurer.

This construction is consistent, moreover, with the design of noncumulation clauses. As noted above, noncumulation clauses were developed to prevent "stacking" by an insured. "Such clauses originated during the shift from 'accident-based' to 'occurrence-based' liability policies in the 1960s and 1970s, and were purportedly designed to prevent any attempt by policyholders to recover under a subsequent policy—based on the broader definition of occurrence—for a loss that had already been covered by the prior 'accident-based' policy." *Viking Pump*, 52 N.E.3d at 1152. And, the New York Court of Appeals has "enforced non-cumulation clauses in accordance with their plain language, despite the limiting impact that such clauses may have on an insured's recovery (and, by extension, that of an injured plaintiff)." *Id.* (citing *Nesmith v Allstate Ins. Co.*, 25 N.E.3d 924 (N.Y. 2014); *Hiraldo v Allstate Ins. Co.*, 840 N.E.2d 563 (N.Y. 2005)). Therefore, based on the policy language at issue and the recent decision from the Court of Appeals in *Viking Pump*, it is irrelevant whether Olin's prior excess policies were issued by an insurer other than OneBeacon.

Our conclusion finds further support in our analysis of a similar prior insurance provision at issue in *Olin III*, in which we "conclude[ed] that the prior insurance provision reduces American Home's liability only to the extent that a prior insurance policy at the same level of coverage . . . *indemnifies for a loss that is also*

31

*covered* by an American Home policy." 704 F.3d at 104 (emphasis added). We also determined that, because we must interpret Condition C in a way that gives effect to both the continuing coverage clause and prior insurance provision, "to the extent the continuing coverage [clause] expands an insurer's liability, it does so subject to the limitations of the prior insurance provision." *Id.* at 104 n.20.

While the insurer in *Olin III* (American Home) issued both the policy under which Olin sought indemnification and the prior policy within the same layer of coverage, after *Viking Pump* it is clear that the critical factor is whether the loss covered by a policy dictating all sums is also covered by another policy in the same coverage layer, which itself has already provided indemnification to the insured for the loss. Although *Viking Pump* did not directly decide the issue we are required to resolve here, its analysis of the interplay between prior insurance provisions and allocation leads directly to our holding. Under an "all sums" or a "joint and several" method for allocation, an insured is permitted "to collect its total liability under any policy in effect during the periods that the damage occurred, up to the policy limits." *Viking Pump*, 52 N.E.3d at 1149 (alteration and internal quotation marks omitted). It is then the insurer's burden to "seek contribution from the insurers that issued the other triggered policies." *Id.* at 1150. In contrast, under the pro rata scheme for allocation, "an insurer's liability is limited to sums incurred by the insured during the policy period; in other words, each insurance policy is allocated a 'pro rata' share of the total loss representing the portion of the loss that occurred during the policy period." *Id.*

32

As Olin argues, application of the all sums method means that it may attribute the full amount of its loss to a single policy year and demand coverage from a single insurer up to the insurer's policy limits (OneBeacon in this case). Yet, this same principle also limits Olin's ability to tap multiple insurers for the same loss. Just as the all sums allocation method allows Olin to seek recovery from any insurer of its choosing up to the limits of the relevant policy, it also, by the same token, requires reducing the limits of liability of any prior insurance policy providing coverage for the same loss. *See Stonewall Ins. Co. v. E.I. du Pont de Nemours & Co.*, 996 A.2d 1254, 1260 (Del. 2010) (examining substantially similar language in light of the all sums approach and concluding that "interpreting the non-cumulation clause to limit how much [an insured] may seek from the selected tower of insurance by subtracting any amounts received by or payable to [the insured] from prior excess insurers [] is the only proper interpretation"). To conclude otherwise would be to strip the prior insurance provision of its bargained-for effect, as evinced by its plain language, and permit Olin to recover multiple times for a single loss by pursuing multiple insurers within the same layer of coverage. *See id.* (concluding that reading noncumulation clause "as ambiguous and in isolation would dishonor the spirit of the clause and improperly allow [the insured] to obtain a double recovery by negating settlements already received from [prior] insurers"). It would also be inconsistent with the "joint and several" principle animating the all sums approach. *Viking Pump*, 52 N.E.3d at 1149, 1152.

Finally, however, we reject out-of-hand OneBeacon's argument that since Olin could recover from prior insurers whose policies provide coverage for loss at these sites and who sit in the same layer of coverage as OneBeacon, Olin may not recover under the OneBeacon policies. This argument turns on a misreading of Condition C. As explained earlier, Condition C permits an insured to pursue indemnification from any insurer whose policy was triggered (under the framework described above) as a result of continuing property damage. The prior insurance provision works in conjunction with the overarching approach dictated by Condition C to prevent the insured from stacking policies once it has *already* obtained indemnification for that specific loss from another policy in the relevant coverage layer. *See Id.* at 1149 (explaining that the all sums approach permits an insured to recover from "any policy in effect during the periods that damage occurred" (internal quotation marks omitted)).

Determining the meaning of the prior insurance provision does not resolve our inquiry. We must now determine the effect of Olin's settlements with its prior insurers—the London Market Insurers—on OneBeacon's obligations. This presents a difficult question, since Olin recovered from the London Market Insurers in settlement of its claims for indemnification, and the record is devoid of any information about these settlements.

OneBeacon contends that the district court should be instructed that "amounts due include amounts due under policies issued by insurers that settled prior to the conclusion of this appeal." Appellant's Br. at 63 (internal quotation

34

marks omitted). In response, Olin claims that its settlements with the London Market Insurers do not constitute "amounts due" under those policies because "not one of those other insurers was ever adjudged liable to Olin or admitted liability . . . [and] even if settlement dollars could be considered amounts due . . . there is nothing in the record showing what amounts (if any) were due . . . ." Appellee's Br. at 66, 68 (internal quotation marks omitted).

While we agree with OneBeacon that its limits of liability should be reduced by amounts paid to settle claims with respect to the five manufacturing sites at issue here, there is no basis in the record from which we might calculate that amount. Indeed, if, as Olin suggests, Olin entered into a global settlement with the London Market Insurers releasing claims under those policies as to all sites potentially at issue—and not just those that were the subject of adjudication at trial in this matter—there is no easy way to determine the amount of this settlement that is properly associated with claims arising from the five manufacturing sites that are the focus of this appeal. In fact, we have previously recognized the difficulties that arise when trying to set off an insured's recovery against prior settlements. *See, e.g.*, *E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 172 n.10 (2d Cir. 2001) (per curiam) (suggesting that the amounts paid in prior settlements had not exceeded aggregate policy limits); *see also id.* at 184 n.1 (Jacobs, *J.*, dissenting) (questioning whether the district court's order required "the excess insurers to pay indemnity in respect of claims that have already been indemnified in full").

In light of this deficiency in the record, we conclude that remand is appropriate in order for the district court to be able to enhance the record and issue a decision in the first instance as to the effect of Olin's prior global settlement with the London Market Insurers. However, a few words as to guiding principles are appropriate.

As just explained, Condition C permits an insured to pursue full recovery from any insurer in its program whose policy covers the relevant loss and contains Condition C irrespective of whether the insurer's policy was issued at the beginning, in the middle, or towards the end of the continuing occurrence. To use the terminology we adopted in *Olin III*, Condition C permits an insured to "sweep[]" loss—under *Viking Pump*, from both before and after the policy year—into a triggered policy and to seek full indemnification from that policy for its covered loss. *Olin III*, 704 F.3d at 104; *Viking Pump*, 52 N.E.3d at 1155–56. In other words, like the joint and several liability that serves as a model for the all sums approach, once the insured has demonstrated the scope of its insurer's indemnification obligation, Condition C shifts the burden to the insurer "to seek contribution from the insurers that issued the other triggered policies." *Viking Pump*, 52 N.E.3d at 1149–50. Thus, under Condition C, the insurer offering coverage for the selected policy year is generally required to demonstrate the existence of valid claims against other available policies and to pursue claims under them.

The prior insurance provision, however, also offers some contractual protection for the insurer. This provision allows the insurer to offset its indemnification

36

obligations by amounts already paid to cover the loss by another insurer in the same coverage tier. *See* App'x at 2138 (permitting the insurer to reduce the limit of liability on the policy if any covered loss was already "covered in whole or in part under any other excess policy" at the same level of coverage). But it would generally be the burden of the insurer to prove its entitlement under this contractual provision. *See Facet Indus., Inc. v. Wright*, 465 N.E.2d 1252, 1254 (N.Y. 1984) (explaining that the burden of proving that a loss falls within a contractual exclusion is on the insurer); *Lindenbaum v. Royco Prop. Corp.*, 165 A.D.2d 254, 258 (1st Dep't 1991) ("The party burdened by the duty . . . usually has the burden of proving the discharge of his duty by the occurrence of a condition subsequent."). If, after appropriate discovery, OneBeacon is able to do so, then the limits of liability on the policies it issued to Olin should be reduced accordingly. With these principles in mind, we remand to the district court for further proceedings on this issue.

## G. PREJUDGMENT INTEREST

OneBeacon also challenges the district court's calculation of prejudgment interest. It argues that the district court's award of prejudgment interest should be vacated because Olin failed to provide a sufficient "definite claim" for loss for which OneBeacon might be found liable, as required by OneBeacon's policies. In light of our conclusion that all sums allocation applies—altering the total sum of damages attributable to a given policy period—it is necessary to remand to the district court so it may recalculate the amount of prejudgment interest.

The district court concluded that Olin is entitled to prejudgment interest pursuant to N.Y. C.P.L.R. § 5001(b). Section 5001(b) "permits a party that prevailed in a breach of contract action to obtain prejudgment interest." *NML Capital v. Republic of Arg.*, 952 N.E.2d 482, 488 (N.Y. 2011). It specifically provides, in relevant part, that "[i]nterest shall be computed from the earliest ascertainable date the cause of action existed . . . ." N.Y. C.P.L.R. § 5001(b).

In an insurance-coverage dispute, the application of § 5001(b) requires that prejudgment interest be calculated from the date the insurer becomes obligated to indemnify the insured. *Cf. NML Capital*, 952 N.E.2d at 488 (explaining that "interest on a sum awarded as a result of a breach of contract is computed from the earliest date that the claim accrued"). An insurer breaches its coverage obligation where it fails to comply with its insured's demand for indemnity. *See Aetna Cas. & Sur. Co. v. Home Ins. Co.*, 882 F. Supp. 1328, 1353 (S.D.N.Y. 1995) ("[T]he accrual of Aetna's cause of action can be identified as maturing when Home failed to comply with Aetna's demand that it indemnify Aetna for payments made in connection with its settlement with Robins."). Courts are afforded "wide discretion in determining a reasonable date from which to award pre-judgment interest." *Conway v. Icahn & Co., Inc.*, 16 F.3d 504, 512 (2d Cir. 1994).

Here, the parties dispute whether the fifteen notices that Olin sent OneBeacon regarding its claims for coverage, beginning in 1984, constitute a "definite claim" such that OneBeacon's refusal to comply with its coverage obligations triggered § 5001(b). OneBeacon contends that, because its policies require that Olin

38

make a "definite claim for any loss for which [OneBeacon] may be liable under the Policy," App'x at 2140, Olin was obligated to provide OneBeacon with a "sum certain" for a particular loss as a condition to coverage. Appellant's Reply Br. at 40. But OneBeacon's interpretation both reads words into, and out of, the policy.

Although the policy does not offer a precise definition for a "definite claim," it does make clear that any such claim needs to be certain only to the extent that it provided OneBeacon with an amount of loss for which OneBeacon "*may* be liable under the Policy." App'x at 2140 (emphasis added). The contract does not require Olin to submit a "definite claim" along with a "sum certain" of such claim, but rather a definite claim along with a description of the insurer's potential liability with respect to that claim. Because we read a contract so as to "give effect to the plain meaning of the words," we reject OneBeacon's contrary reading. *Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96, 99 (2d Cir. 1989).

Thus, because Olin furnished numerous documents and updates to OneBeacon concerning its losses and descriptions as to its expenditures at each site, we agree with the district court's determination that prejudgment interest should be calculated as of the dates when Olin incurred various remediation costs. In any event, it is worth noting that it has been OneBeacon's position all along that it has *no* obligation to indemnify Olin. It has denied coverage for over twenty years. Having been found liable for coverage to Olin, OneBeacon cannot now benefit from its tactical decision to deny its contractual obligation to indemnify Olin for covered losses by avoiding liability for interest. It is not the intention of § 5001(b) that an

39

insurer could deny coverage for years in the face of reasonable demands and then, once it is adjudicated liable, avoid paying any prejudgment interest. As a result, remand on this point is necessary only for the reasons noted by Olin: to allow the district court an opportunity to adjust Olin's prejudgment interest award in light of our holding regarding all sums allocation.

## III. OLIN'S CROSS-APPEAL

Olin cross-appeals the district court's grant of summary judgment in favor of OneBeacon on Olin's Chapter 93A claim under Massachusetts law. Chapter 93A of Massachusetts General Laws prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). Olin claims that OneBeacon engaged in unfair and deceptive acts by refusing to pay meritorious claims without conducting a reasonable investigation and forcing Olin to litigate in order to recover amounts due under OneBeacon's policies. *See* Mass Gen. Laws ch. 176D, § 3(9)(d) (defining "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information" in the context of an insurance policy as an unfair or deceptive practice). In ruling from the bench, the district court granted summary judgment in favor of OneBeacon and dismissed Olin's claim because, in the court's "view, there is no substance, whatever, to an application under a Massachusetts statute which talks in terms of unfair methods of competition, unfair or deceptive acts . . . [and] OneBeacon never committed such acts." Special App'x at 28.

40

Applying Massachusetts' discovery rule, we agree with OneBeacon that summary judgment in its favor on Olin's Chapter 93A claim is proper because Olin's Chapter 93A claim is barred by the applicable statute of limitations.[11] Under Massachusetts' discovery rule, the statute of limitations governing Chapter 93A claims begins to run only "when the cause of action is discovered or reasonably should have been discovered by the plaintiff." *Anawan Ins. Agency, Inc. v. Div. of Ins.*, 946 N.E.2d 668, 693 (Mass. 2011). "In applying the 'reasonably should have known' standard at issue in the discovery rule, reasonable notice that a particular act of another person may have been a cause of [the] harm to a plaintiff creates a duty of inquiry and starts the running of the statute of limitations." *Ross v. Garabedian*, 742 N.E.2d 1046, 1053 (Mass. 2001).

As OneBeacon points out, Olin's complaint alleged, as part of the factual basis for Olin's Chapter 93A claim, that "Commercial Union [OneBeacon's predecessor] . . . wholly ignored Olin's repeated notifications of claims provided from and after 1984 in respect of certain of Olin's Claims." App'x at 1030. The complaint further alleged that "Commercial Union has failed and refused to affirm or deny coverage in respect of Olin's Claims for an unreasonable period of time – and in many cases, has never affirmed or denied coverage in respect of certain of Olin's Claims." App'x at 1030. In other words, according to its own allegations, since Olin knew

---

[11] We assume, with the parties, that Massachusetts' four-year statute of limitations, along with its associated tolling rules, applies. *See Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 296 (2d Cir. 2000) (explaining that when the parties' arguments assume that the law of a certain jurisdiction controls the dispute, the parties are deemed to have given implied consent to application of that law); *see also* Mass. Gen. Laws ch. 260, § 5A (providing for a four-year statute of limitations in consumer protection actions).

that OneBeacon never responded directly to its notices and never affirmed or denied the coverage responsibilities these notices sought to invoke, Olin actually knew or, at the very least, should have known of the factual predicates for its Chapter 93A claim at some point either in the 1980s or the early 1990s. *See Patsos v. First Albany Corp.*, 741 N.E.2d 841, 846–47 (Mass. 2001) (explaining that, under the discovery rule, a cause of action accrues when a plaintiff "knew, or in the exercise of reasonable diligence should have known, of the factual basis for a cause of action").

Olin argues, in effect, that it did not understand at the time the full extent of OneBeacon's alleged failure to investigate Olin's claims and so could not have brought its Chapter 93A claim at the time. But this is precisely how Massachusetts' discovery rule operates: it starts the statute of limitations as soon as the plaintiff had sufficient information to pursue a claim and requires a putative plaintiff to conduct a reasonable investigation to inquire whether it has sufficient grounds on which to bring a claim. *See Cambridge Plating Co. v. Napco, Inc.*, 991 F.2d 21, 26–29 (1st Cir. 1993). Having failed to do so, Olin cannot now argue that the statute of limitations was, in fact, tolled the entire time. For this reason, we affirm the district court's grant of summary judgment in favor of OneBeacon on Olin's Chapter 93A claim. *Cf. Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 3d 395, 413 (2d Cir. 2014) ("It is well settled that this Court may affirm on any basis for which there is sufficient support in the record, including grounds not relied on by the district court." (internal quotation marks omitted)).

42

## IV. CONCLUSION

For the foregoing reasons, the judgments of the district court are **AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**